## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JEANINE MARIA SHUFELT,** | : | **Civil No. 1:15-CV-1026** |
| | : | |
| **Plaintiff,** | : | **( Judge Kane)** |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **CAROLYN W. COLVIN,** | : | |
| **Commissioner of the** | : | |
| **Social Security Administration** | : | |
| | : | |
| **Defendant.** | : | |

## REPORT AND RECOMMENDATION

### I.   INTRODUCTION

The Social Security Administration oversees a number of programs designed to assist those facing medical challenges. For example, under Title II of the Social Security Act, the Commissioner provides for disability insurance benefits for workers who have become disabled.  42 U.S.C. § 423. Title XVI of the Social Security Act, in turn, establishes the Supplemental Security Income benefit program, or SSI. "The SSI program, which is another public assistance program established by federal statute, see 42 U.S.C. §§ 1381–1383 (1982), provides cash grants to low-income individuals who are aged, blind, or disabled. 42 U.S.C. § 1381 (1982)." Com. of Pa. v. United States, 752 F.2d 795, 797 (3d Cir. 1984).

These two programs, which are part of a broader and more comprehensive network of care for the infirm and disabled, each have their own eligibility requirements and standards. Moreover, as the Commissioner has long acknowledged the requirements to qualify for benefits under Title II and Title XVI differ in a number of material respects. <u>See</u> SSR 83-20, 1983 WL 31249. Thus. Title II provides for some retroactive benefits whereas Title XVI does not. <u>Id</u>. Moreover, unlike Title XVI applicants, "[a] title II worker cannot be found disabled under the Act unless insured status is also met at a time when the evidence establishes the presence of a disabling condition(s)." <u>Id</u>. Thus, while claimants may apply for both forms of relief under the Act, the availability of relief under Title II and Title XVI may differ significantly, requiring independent evaluation of any claim made under both provisions of the law.

In particular, oftentimes the periods of eligibility for benefits under these two programs will vary widely. In such a setting: "[b]ecause [a] plaintiff's Title II and Title XVI claims are based on separate periods of eligibility, and therefore on separate evidence, they [should] be individually reviewed." <u>Baxter v. Schweiker</u>, 538 F. Supp. 343, 346 (N.D. Ga. 1982). Given the fact that Title II and Title XVI claims are often based upon separate eligibility periods, each class of claims warrants a separate analysis, even though the substantive standards which govern review of the merits of the claims are largely identical. <u>See Bowen v. Galbreath</u>, 485 U.S. 74, 79, 108 S. Ct.

892, 895, 99 L. Ed. 2d 68 (1988)(citing legislative history indicating Congress' intent to make judicial review under Title II and Title XVI "virtually identical," to "provide the same rights to ... judicial review" under both Titles, and "to apply the same rules of judicial review to Title XVI cases as apply to Title II cases.")

## II.    STATEMENT OF FACTS AND OF THE CASE

### A.    SHUFELT'S MENTAL HEALTH HISTORY

This case aptly illustrates the importance of conducting independent review of Title II and Title XVI claims due to their separate eligibility periods. The plaintiff in this case, Jeanine Shufelt, filed disability claims under Title II and Title XVI of the Social Security Act on February 27, 2012. Shufelt's application alleged disability based upon a constellation of profound mental health conditions, including bipolar disorder, depression, and anxiety. (Tr. 74-89.) Shufelt's Title II and Title XVI claims were subject to strikingly different eligibility periods. With respect to Shufelt's Title II claim, her alleged date of onset was November 1, 2008 and her date last insured was December 31, 2009. Thus, to prevail on this claim Shufelt was required to demonstrate that she was wholly disabled during this 13 month period between November 2008 and December 2009. In contrast, Shufelt's SSI application sought benefits for a markedly different period of time, beginning on February 27, 2012 and continuing up to the date of the ALJ's decision denying her application, November 25,

2013.

The substantial differences between these two eligibility periods was material in this case since the vast bulk of the evidence supporting Shufelt's claim of disabling mental health impairments in this case related to care, treatment and opinion evidence from 2011 through 2013. There was a relative paucity of proof supporting any claim of disability based upon these emotional impairments for the period from 2008 through 2009, the time frame embraced by Shufelt's Title II DIB application.  In contrast, the medical evidence relating to Shufelt's impairment during the period embraced by her Title XVI SSI application, February 2012 through November 2013, was significant and compelling. That evidence included the opinion and assessment of Shufelt's treating mental health provider, Dr. Michael Campbell, who found that Shufelt's mental illness was wholly disabling. In reaching this conclusion Dr. Campbell noted, in part, that even on medication when Shufelt's condition was stable she at times experienced hallucinations and episodes of paranoia and distractability that would be debilitating in the work place. Dr. Campbell also described a course of mental illness in 2012 and 2013 which was marked by wildly inconsistent swings in mental state and stability, varying mental states which he opined made sustained work impossible for Shufelt.

There was significant evidence supporting Dr. Campbell's conclusion, which

focused exclusively on Shufelt's mental status during the period encompassed by her SSI application, 2012 through 2013. At the outset Shufelt was hospitalized for approximately 14 days in the Fall of 2011 due to these mental health complications. Shufelt's medical records and her own testimony also thoroughly documented episodic, but profound, mental disturbances, including recurring hallucinations. Moreover, between December of 2011 and October of 2013 mental health professionals conducted approximately fifteen Global Assessment of Functioning (GAF)[1] evaluations of Shufelt. The results of these multiple evaluations by mental

---

[1]A GAF score, or a Global Assessment Functioning scale, takes into consideration psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness and is not supposed to include the consideration of impairment in functioning due to physical (or environmental) limitations. *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision*, 34, Washington, DC, American Psychiatric Association, 2000. ("DSM-IV-TR"). In this regard, GAF scores "in the range of 61–70 indicate 'some mild symptoms [of depression] or some difficulty in social, occupational, or school functioning.' Diagnostic and Statistical Manual of Mental Disorders ('DSM IV') 34 (American Psychiatric Assoc.2000). GAF scores in the 51–60 range indicate] moderate impairment in social or occupational functioning." Cherry v. Barnhart, 29 F. App'x 898, 900 (3d Cir.2002). DaVinci v. Astrue, 1:11-CV-1470, 2012 WL 6137324 (M.D. Pa. Sept. 21, 2012) report and recommendation adopted, Davinci v. Astrue, 1:11-CV-1470, 2012 WL 6136846 (M.D. Pa. Dec. 11, 2012). "A GAF score of 41–50 indicates 'serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).' DSM–IV at 34. A score of 50 is on the borderline between serious and moderate symptoms." Colon v. Barnhart, 424 F. Supp. 2d 805, 809 (E.D. Pa. 2006). While we acknowledge that the current version of the DSM has now abandoned the GAF score, this score was an accepted analytical benchmark at the time of Shufelt's treatment, and was relied upon

health professionals were telling and corroborated Dr. Campbell's findings in at least two significant ways.

First, approximately nine of the evaluations conducted over this two year span documented mental health symptoms that were either severe, or rested on the borderline between severe and moderate. This is an extensive body of clinical evidence reflecting a profound level of impairment.  Further, the six GAF score assessments which disclosed moderate to mild symptoms, when juxtaposed with the other GAF scores, confirmed and underscored a key element of Dr. Campbell's opinion. That opinion rested in part upon the doctor's conclusion that there were wild fluctuations in Shufelt's mental health status throughout 2012 and 2013, fluctuations which rendered her unable to perform sustained work. The fifteen GAF scores, taken as a whole, provide compelling support for this proposition. For example, in December 2011 Shufelt's GAF score was 30; by August 2012 it was 70; between January and March of 2013 Shufelt's GAF score hovered between 40 and 50; and during the period from April through October 2013, Shufelt's Global Assessment of Functioning was found to rest between 50 and 60.  Therefore, the startling range and deviation of these GAF scores precisely confirmed the mental health instability and

---

by the ALJ in deciding this case. Therefore, we will examine these GAF scores as part of our assessment of this matter.

fluctuation which Dr. Campbell found precluded sustained employment.

Arrayed against this substantial body of evidence was a single, equivocal assessment of limited value, particularly when it came to resolving Shufelt's 2012-2013 SSI application. This document was a summary six page Psychiatric Review Technique (PRT) assessment that was completed in April of 2012, which concluded that there was insufficient evidence to support Shufelt's 2008-2009 Title II disability insurance benefit claim. (Tr. 37-42.) This assessment was an exceedingly thin evidentiary reed in this case for at least four reasons. First, it was prepared near the outset of Shufelt's application process in April of 2012. Second, on its face, this assessment seems to only consider Shufelt's Title II DIB application, which involved a 2008-2009 time frame. Thus it did not speak to her mental state in 2012-2013, the critical issue in any SSI application review. Third, the assessment did not consider the full body of Shufelt's 2012-2013 treatment records, since those records did not exist at the time of the assessment. Therefore, none of Shufelt's reported hallucinations, GAF scores or medical evaluations from 2013 were considered in reaching this assessment. Finally, this assessment did not consider the October 2013 opinions of Shufelt's treating physician Dr. Campbell, opinions which must be given great weight under Social Security regulations.

It is against the backdrop of this mental health history that the ALJ issued its

November 25, 2013 decision denying Shufelt's two applications of DIB and SSI benefits.(Tr. 7-27.)

### B.   THE ALJ DECISION

On November 25, 2013, the Administrative Law Judge (ALJ) issued a decision denying both Shufelt's Title II DIB application and her separate Title XVI SSI application. (Tr. 7-27.) While that decision acknowledged the existence of these two applications, and denied both applications, there is nothing in the decision which indicates that the ALJ recognized, considered or reconciled the fact that the applications covered divergent time periods separated by several years. Thus, we cannot discern from the decision the degree to which evidence relating to one claim may have been conflated into the analysis of a separate and distinct claim.  This is a material ambiguity in the ALJ's decision since there is some indication of conflation of evidence and claims in that opinion. Specifically, the ALJ's decision places what is referred to as "appropriate weight" on an April 2012 Psychiatric Review Technique (PRT) when assessing these claims. (Tr. 25.) However, that assessment, on its face, only addressed the 2008-2009 DIB claim, and had dubious value as a benchmark for assessing Shufelt's 2012-2013 SSI application, since it did not evaluate the vast body of medical and opinion evidence amassed in support of this claim, much of which was obtained only after this PRT was completed.

8

The failure of the decision to clearly delineate between these two claims, which involved eligibility dates separated by years, confused the analysis of the claims in another respect. While there was a relative paucity of proof supporting claim that Shufelt was totally disabled in 2008-2009, a great deal of evidence supported the conclusion that Shufelt faced significant psychological impairments in 2012 through 2013, the period encompassed by her SSI application. With respect to this time frame, the ALJ's assessment of the evidence consisted of a wholesale rejection of many of the conclusions made by the treating source, Dr. Campbell, whose opinion was given no weight by the ALJ in a number of material respects. The ALJ then discounted the nine GAF scores which assessed Shufelt as suffering from severe or borderline-severe impairments, while crediting the six GAF scores which assessed Shufelt as suffering from moderate to mild impairments. (Tr. 24.) This aspect of the ALJ's decision was curious in one respect, which was not further detailed in the decision itself. The ALJ observed that from April through October 2013 Shufelt's Global Assessment of Functioning was found to rest between 50 and 60. To the extent that these GAF scores at 50 suggested borderline symptoms, the ALJ rejected the scores; however, to the extent that the same reports exceeded GAF scores of 50, suggesting moderate symptoms, the ALJ credited the GAF scores. Thus, the ALJ's decision seemingly simultaneously rejects and credits the same series of GAF scores. Further, the ALJ's

decision did not address or discuss in a meaningful way Dr. Campbell's broader opinion and observation that the wide fluctuations in these GAF scores, by itself, was emblematic of disabling variances in Shufelt's mental state.  Finally, in its decision the ALJ accorded "appropriate weight" to the April 2012 Psychiatric Review Technique, and seemingly relied upon that evaluation in part to reject Shufelt's 2012-2013 SSI claim. The ALJ seems to have reached this conclusion even though this assessment was prepared near the outset of Shufelt's application process in April of 2012; on its face seemed to only consider Shufelt's Title II DIB application, which involved a 2008-2009 time frame; did not consider the full body of Shufelt's 2012-2013 treatment records, since those records did not exist at the time of the assessment; and did not consider the opinion of Shufelt's treating physician Dr. Campbell, an opinion which must be given great weight under Social Security regulations.

After exhausting her administrative appeals with respect to this adverse decision, Shufelt filed in instant appeal. (Doc. 1.) This case is fully briefed by the parties and is, therefore, ripe for resolution. (Docs. 15 and 16.)

In addressing this appeal, we acknowledge a fact which was not addressed by the ALJ but is material in this case; namely, "plaintiff's Title II and Title XVI claims are based on separate periods of eligibility, and therefore on separate evidence, [accordingly] they [should] be individually reviewed." Baxter v. Schweiker, 538 F.

Supp. 343, 346 (N.D. Ga. 1982). Adopting this analytic lens, for the reasons set forth below, we recommend that the court affirm the denial of Shufelt's Title II application but remand this case for further consideration of Shufelt's Title XVI application.

## III.   DISCUSSION

### A.   SUBSTANTIAL EVIDENCE REVIEW – THE ROLE OF THIS COURT.

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.   See 42 U.S.C. §405(g); 42 U.S.C. §1383(c)(3)(incorporating 42 U.S.C. §405(g) by reference); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200(3d Cir. 2008); Ficca v. Astrue, 901 F.Supp.2d 533, 536(M.D.Pa. 2012).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  But in an adequately developed factual record, substantial evidence may be "something less

than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F.Supp.2d 623, 627 (M.D.Pa. 2003). The question before this Court, therefore, is not whether Plaintiff is disabled, but whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014)("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.")(alterations omitted); Burton v. Schweiker, 512 F.Supp. 913, 914 (W.D.Pa. 1981)("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990)(noting that the scope of review on legal matters is plenary); Ficca, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").


      **B.**    <u>**INITIAL BURDENS OF PROOF, PERSUASION AND ARTICULATION FOR THE ALJ.**</u>

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); see also 20 C.F.R. §§404.1505(a), 416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant

is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between steps three and four, the ALJ must also assess a claimant's RFC.  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.  20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

At steps one through four, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work.  42 U.S.C. §423(d)(5); 42 U.S.C. §1382c(a)(3)(H)(i)(incorporating 42 U.S.C. §423(d)(5) by reference); 20 C.F.R. §§404.1512, 416.912; Mason, 994 F.2d at 1064.

Once this burden has been met by the claimant, it shifts to the Commissioner at step five to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education,

work experience and RFC.  20 C.F.R. §§404.1512(f), 416.912(f); <u>Mason</u>, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981).  Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Id</u>. at 706-707.  In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." <u>Schaudeck v. Com. of Soc. Sec</u>., 181 F. 3d 429, 433 (3d Cir. 1999).

### C.   <u>LEGAL BENCHMARKS FOR THE ALJ'S ASSESSMENT OF MEDICAL OPINION EVIDENCE.</u>

The Commissioner's regulations defines medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [a claimant's] symptoms, diagnosis and prognosis, what [a claimant] can still do despite

15

impairments(s), and [a claimant's] physical or mental restrictions.   20 C.F.R. §§404.1527(a)(2), 416.927(a)(2).[2]  Regardless of its source, the ALJ is required to evaluate every medical opinion received.  20 C.F.R. §§404.1527(c), 416.927(c).

In deciding what weight to accord to competing medical opinions, the ALJ is guided by factors outlined in 20 C.F.R. §§404.1527(c) and 416.927(c).  "The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker."  Social Security Ruling ("SSR") 96-6p, 1996 WL 374180 at *2 (S.S.A. 1996).

Treating sources have the closest ties to the claimant, and therefore their opinions are generally entitled to more weight.  See 20 C.F.R. §§404.1527(c)(2), 416.927(c)(2)("Generally, we give more weight to opinions from your treating sources...");  20 C.F.R. §§404.1502, 416.902 (defining treating source).  Under some circumstances, the medical opinion of a treating source may even be entitled to

---

[2]Medical source opinions on issues that are dispositive of a case, i.e., whether a claimant is disabled, are reserved to the Commissioner and do not constitute medical opinions defined by 20 C.F.R. §§404.1527(a)(2) and 416.927(a)(2).  20 C.F.R. §§404.1527(d), 416.927(d).  Such opinions must never be ignored, and must be considered based on the applicable factors in 20 C.F.R. §§404.1527(c) and 416.927(c).  SSR 96-5p, 1996 WL 374183 at *3 (S.S.A. 1996).  However, medical opinions on issues reserved Commissioner, regardless of their source, are never entitled to controlling weight under 20 C.F.R. §§404.1527(c)(2) and 416.927(c)(2). See 20 C.F.R. §§404.1527(d)(3), 416.927(d)(3); SSR 96-5p, 1996 WL 374183 at *2.

controlling weight.  20 C.F.R. §§404.1527(c)(2), 416.927(c)(2); see also SSR 96-2p, 1996 WL 374188 (S.S.A. 1996)(explaining that controlling weight may be given to a treating source's medical opinion only where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and it is not inconsistent with the other substantial evidence in the case record).

Where no medical source opinion is entitled to controlling weight, the Commissioner's regulations direct the ALJ to consider the following factors, where applicable, in deciding the weight given to any non-controlling medical opinions: length of the treatment relationship and frequency of examination; nature and extent of the treatment relationship; the extent to which the source presented relevant evidence to support his or her medical opinion, and the extent to which the basis for the source's conclusions were explained; the extent to which the source's opinion is consistent with the record as a whole; whether the source is a specialist; and, any other factors brought to the ALJ's attention.  20 C.F.R. §§404.1527(c), 416.927(c).

Furthermore, as discussed above, it is beyond dispute that, in a social security disability case, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter, 642 F.2d at 704. This principle applies with particular force to the opinion of a treating physician. See 20 C.F.R. §§404.1527(c)(2), 416.927(c)(2)("We will always give good reasons in our notice of

determination or decision for the weight we give your treating source's opinion."). "Where a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or the wrong reason.'" Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999)(quoting Mason, 994 F.2d at 1066)); see also Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000).

> ### D.   THE DECISION DENYING SHUFELT TITLE II BENEFITS SHOULD BE AFFIRMED, BUT THE DECISION DENYING TITLE XVI BENEFITS SHOULD BE REMANDED FOR FURTHER CONSIDERATION OF THE MEDICAL EVIDENCE

As we have noted, in this case the "plaintiff's Title II and Title XVI claims are based on separate periods of eligibility, and therefore on separate evidence, [thus] they [should] be individually reviewed." Baxter v. Schweiker, 538 F. Supp. 343, 346 (N.D. Ga. 1982). Indeed, the difference in the relevant eligibility dates between these two applications is significant and striking. With respect to Shufelt's Title II claim, her alleged date of onset was November 1, 2008 and her date last insured was December 31, 2009. Thus, to prevail on this claim Shufelt was required to demonstrate that she was wholly disabled during this 13 month period between November 2008 and December 2009. In contrast, Shufelt's Title XVI SSI application sought benefits for a markedly different period of time, beginning on February 27, 2012 and continuing up to the date of the ALJ's decision denying her application, November 25, 2013.

This material differences in the plaintiff's eligibility dates for these two forms of benefits was not clearly identified, acknowledged or addressed by the ALJ in the decision denying both forms of benefits. Since the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests," Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981), the ALJ's failure to even acknowledge the material differences between these two applications in terms of these eligibility dates, standing alone, may compel remand. However, as we have noted, in some instances, the ALJ's decision does more than simply neglect to address this material fact. The decision actually seems to conflate evidence relating to one claim and apply that evidence in addressing Shufelt's separate and distinct claim. With respect to Shufelt's Title II application, we find that this oversight and potential conflation of evidence was harmless since there was a paucity proof which would tend to establish that Shufelt was wholly disabled by her mental health conditions during the period embraced by her Title II DIB application , November 2008 through December 2009. Therefore, we recommend that the decision denying Title II benefits, which is supported by substantial evidence, be affirmed.

The same cannot be said with respect to Shufelt's Title XVI application for SSI benefits. This application embraced a period from February 2012 through the date of the ALJ decision, November 2013. Unlike Shufelt's Title II DIB claim, a significant

body of evidence supported Shufelt's distinct Title XVI SSI application. That body of evidence included a 14 day hospitalization in the Fall of 2011, as well as multiple reports of profound mental illness for Shufelt, including persistent reports that Shufelt suffered from episodic and severe hallucinations. Further, Shufelt's medical records documented some fifteen GAF scores, assessing her mental state between December 2011 and October of 2013. Nine of these scores assessed Shufelt's symptoms as severe or borderline severe. The remaining six GAF scores, which rated Shufelt's symptoms as moderate to mild, were interspersed among these more profound and grave assessments, thus underscoring one of the principal findings of Shufelt's treating physician, who concluded that these wild variations in her mental state had the effect of disabling this plaintiff during 2012 and 2013. In fact, based upon this body of clinical evidence, Shufelt's treating physician, Dr. Campbell, opined that the erratic and profound course of her illness would be disabling.

The ALJ's treatment of this separate and distinct application in our view requires further consideration for several reasons. First, we note that the ALJ's sweeping decision to give no weight to many of Dr. Campbell's opinions is difficult to reconcile with the clinical evidence in this case without some further and more detailed explanation. In addition, the ALJ's discussion of the fifteen GAF scores in this case requires some further explanation on at least three scores. First, the ALJ

should provide some clearer explanation of the decision to credit only the six scores which showed moderate to mild impairment while rejecting the nine scores which revealed severe and borderline severe symptoms. Second, the ALJ should further clarify that part of the decision which discussed Shufelt's GAF scores from April through October 2013. During this time, Shufelt's Global Assessment of Functioning was found to rest between 50 and 60, a range that extends between borderline severe impairment and moderate symptoms. In its decision, the ALJ rejected these scores to the extent that these GAF scores at 50 suggested borderline symptoms. At the same time, to the extent that the same reports exceeded GAF scores of 50, suggesting moderate symptoms, the ALJ credited the GAF scores. Thus, the ALJ's decision seemingly rejects and credits the same series of GAF scores. Some additional explanation of the rationale for simultaneously accepting and rejecting these scores is needed. Further, the ALJ's decision to parse these scores, accepting the six highest scores while rejecting the nine lowest scores, did not address or discuss in a meaningful way Dr. Campbell's broader opinion and observation that the wide fluctuations in these GAF scores, was emblematic of disabling variances in Shufelt's mental state. In the absence fo some more fulsome discussion, we cannot say that this analysis demonstrates that substantial evidence supported the ALJ's decision in this case with regard to Shufelt's Title XVI application.

21

Finally, the ALJ's decision to deny SSI benefits to Shufelt seemed premised in part upon the Psychiatric Review Technique (PRT) completed in April, 2012. The reliance upon this April 2012 assessment highlights the problems of confusion and conflation of claims which lies at the heart of this case. In its decision the ALJ accorded "appropriate weight" to the April 2012 Psychiatric Review Technique, and seemingly relied upon that evaluation in part to reject Shufelt's 2012-2013 SSI claim. This decision is problematic in a number of respects. First, without some further explanation, it is difficult to determine what the ALJ meant when she stated that she was according "appropriate weight" to this PRT. "Appropriate weight" may mean many things, including no weight, slight weight, great weight or controlling weight. We cannot discern on the basis of the ALJ's opinion what weight this evidence actually received. Further, this PRT assessment on its face only appears to relate to an evaluation of Shufelt's 2008-2009 application for Title II DIB benefits, yet the ALJ appears to rely on this assessment to bolster the conclusion that Shufelt's 2012-2013 Title XVI SSI application should also be denied.

It is difficult to see how this April 2012 assessment can be relied upon for the purpose of denying Shufelt's SSI application for at least three reasons. First, this assessment was prepared near the outset of Shufelt's application process in April of 2012. Second this assessment did not, and could not, consider the full body of

Shufelt's 2012-2013 treatment records, since those records did not exist at the time of the April 2012 assessment. Finally, this assessment did not, and could not, consider the subsequent October 2013 opinions of Shufelt's treating physician Dr. Campbell, opinions which must be given great weight under Social Security regulations.

Taken together, we believe that these ambiguities, uncertainties and apparent inconsistences with respect to the treatment of Shufelt's Title XVI application, which embraced the period from February 2012 to November 2013, compels a remand of that claim for further consideration by the Commissioner. Given the flaws inherent in the ALJ's treatment of this medical evidence, we find that this evidence is insufficient to allow us to conclude that "substantial evidence" supports the ALJ's decision to reject these examining medical opinions.   Yet, while case law calls for a remand and further proceedings by the ALJ in this case further assessing this SSI claim under the five-step sequential analysis applicable to such claims, and expressly address this medical evidence, nothing in this report and recommendation should be construed as suggesting what the outcome of that final and full analysis should be.

## IV.   RECOMMENDATION

Accordingly, for the foregoing reasons, IT IS RECOMMENDED that the decision of the Commissioner be AFFIRMED with respect to the plaintiff's Title II

application for DIB benefits, but REMANDED for further consideration of the plaintiff's Title XVI application for SSI benefits.

The parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 15th day of September, 2016.

*S/Martin C. Carlson*
**Martin C. Carlson**
**United States Magistrate Judge**